**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

YANISSE ADRIAN,

**Plaintiff,**

**v.**

MESIROW FINANCIAL STRUCTURED
SETTLEMENTS, LLC, <u>et al.</u>,

**Defendants.**

**Civil No.** 08-1180 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge

Before the Court is defendants' motion for summary judgment
(Docket No. 132), plaintiff's opposition (Docket No. 147), and
defendants' reply (Docket No. 166.)  On June 10, 2010, the Court
granted the defendants' motion for summary judgment and dismissed
the case with prejudice.  (Docket No. 182.)  This opinion sets
forth the reasons for that dismissal.

**I.   Background**

In August, 1998, plaintiff Yanisse Adrian ("Adrian") was
seriously injured and is now a paraplegic as the result of a
shooting that occurred in the Montehiedra Mall parking lot in San
Juan, Puerto Rico.  Adrian brought suit in this Court to recover
money damages for the injuries she alleged were caused by a lack of
security at the premises where the incident occurred (Civil
Number 03-1890).  The parties attempted to settle that case in 2006
prior to the start of trial, but those negotiations did not bear

fruit.   On April 17, 2007, three weeks into trial, the parties agreed to settle for five million dollars ($5,000,000).

In her Amended Complaint of January 9, 2008 (Docket No. 13), Adrian contends that she only agreed to the $5,000,000 settlement as a result of her reliance on numerous representations made to her by defendant Mesirow Financial Structured Settlements, LLC ("Mesirow"), a structured settlement broker.   Adrian further alleges that she would not have agreed to the terms of the April 17, 2007 settlement were it not for her reliance on Mesirow's advice and promises regarding Adrian's tax immunity.   Adrian alleges that she relied on Mesirow to advise her regarding Puerto Rico's tax laws and the requirements of Puerto Rico's Treasury Department ("Hacienda"), and that Mesirow made representations to the effect that Adrian would not owe taxes to Puerto Rico (nor would any withholding occur) related to the settlement of her suit if she opted to rely on Mesirow's services.   Adrian contends she suffered damages because the payment of her settlement was delayed as a result of the disagreement that ensued regarding the settlement's terms and because she lost her opportunity to finish her trial.[1]

_____

[1] A change to Puerto Rico's tax code potentially made payments for emotional distress damages taxable.   See 13 L.P.R.A. §8422 (b)(5); Docket No. 13 at 3; 13 L.P.R.A. §8547.   Since then, that change has been rescinded, and Adrian received her settlement payment from all defendants as well as interest resulting from the delay between the settlement agreement and the repeal of the controversial tax code change from all but one defendant.

Based on these alleged misrepresentations and the damages allegedly suffered as a result, Adrian accuses Mesirow of (1) negligence; (2) negligent misrepresentation; (3) fraudulent inducement; (4) breach of fiduciary duty; (5) equitable estoppel; and (6) promissory estoppel.[2] Adrian voluntarily dismissed her claims against Mesirow for civil conspiracy and intentional interference with contractual relations. (Docket No. 147 at 28.)

Mesirow argues that it at no time influenced Adrian's settlement decisions; that Mesirow had a legitimate concern that it not be exposed to potential tax liability or regulatory action against their insurance licenses and/or criminal prosecution for failure to follow Puerto Rico law; that it was Adrian who caused the delay in payment; and that Adrian only intended to structure one-half of her net settlement proceeds and to take the remaining one-half in cash.

## II. Local Rule 56

Local Rule 56 requires parties to support a motion for summary judgment with a statement of material facts as to which the moving party contends there is no genuine issue of material fact to be

---

[2] Adrian also sued Continental Casualty Company, Chubb Insurance Company of New Jersey, Fireman's Fund Insurance Company, and other defendants in the underlying case for damages stemming from their alleged failure to comply with the April 17, 2007, settlement, in a separate action which still continues as civil action 08-1179 (ADC). (See Docket No. 44 in Civil Action 08-1179.) In the 08-1179 case, the defendants moved the court for enforcement of the April 17, 2007, settlement, which the court denied. (See Docket Nos. 112, 119 in Civil Action 08-1179.)

tried. Loc.Civ.R. 56(b). As a general principle, parties may not include legal arguments or conclusions in their statement of facts. See MVM Inc. v. Rodriguez, 568 F.Supp.2d 158, 163 (D.P.R. 2008); Juarbe-Velez v. Soto-Santiago, 558 F.Supp.2d 187, 192 (D.P.R. 2008). Both parties, but most egregiously the plaintiff, have failed to comply with this principle.

The plaintiff's additional statement of uncontested facts does not present separate facts supported by reference to record citation as required by Local Rule 56; the statement submits lengthy paragraphs containing statements of argument, opinion, and conclusion which more often than not contain no factual statements. If and when a factual statement is present, however, it is intertwined with argument, opinion or conclusion that requires an exhausting process to pick apart the offending paragraph, something that this Court will not undertake. Counsel should note that these lengthy paragraphs confuse facts with conclusory statements, opinions and arguments and as such are not appropriate under Local Rule 56.

Where the Court can easily distinguish a statement of fact from an argument or other sort of statement, that fact will be added to the record if properly supported. The Court disregards entirely, however, all arguments, opinions and conclusions improperly submitted as additional facts.

## III. Uncontested Facts

### Underlying Case

On August 19, 2003, plaintiff filed civil action 03-1890 ("underlying case") in this Court for physical and mental damages suffered as a result of a shooting incident that occurred at the Montehiedra Mall in Puerto Rico. (Docket No. 132-1 at 2.) In her third amended complaint in the underlying case, plaintiff claimed that her damages were due to the fault or negligence of Ranger American of Puerto Rico, Inc., for failure to provide reasonable security at the mall premises. Id. Plaintiff also alleged that Manley Berenson Montehiedra Management ("Manley Berenson"), the malls' owner, was "negligent in implementing managerial or operational strategies, actions and decisions relating [to] mall security." Id. (quoting from Docket No. 93 in Civil Action 03-1890). Plaintiff named the Continental Casualty Company ("Continental") as an insurer of Manley Berenson in her complaint in the underlying case. Id. at 2.

Plaintiff's counsel of record for the underlying case included Paul Hulsey ("Hulsey"), Cherie K. Durand ("Durand"), and Jose Quetglas ("Quetglas"). Id. Eric Quetglas also appeared as counsel for plaintiff in the underlying case, filing documents on Adrian's behalf and appearing at trial. Id. Hulsey and Durand were lead counsel during the case, trial, and during negotiations. Gustavo Gelpi ("Gelpi") and Arturo Diaz ("Diaz") were both counsel for

Manley Berenson and Continental.  Id. at 3 (citing the docket sheet
in the underlying case 03-1890).   The Court discusses other
participants in the underlying case as necessary.

Events Leading to Trial

The parties engaged in a prolonged initial settlement
negotiation prior to trial.  On January 14, 2005, Hulsey wrote a
letter to Gelpi in which he made a settlement demand on behalf of
Adrian for what he understood were the limits of Manley Berenson's
insurance policy coverage:  fifty million dollars ($50,000,000).
(Docket No. 132-2.)

On August 26, 2005, Fireman's Fund Insurance Company
("Fireman's Fund"), another insurance carrier for Manley Berenson,
and a defendant named in case 08-1179 (ADC), contacted Connie
Klinger ("Klinger"), a representative of Mesirow, to work on the
underlying case.[3]  Klinger is a licensed life insurance agent and
a certified structured settlement consultant.  (Docket No. 132-14
at 5, 3.)  Mesirow and Klinger are both members of the National
Structured Settlements Trade Association (NSSTA).  At the date of
her deposition for this case, on December 7, 2009, Klinger had been
a structured settlement broker for almost nine years.  (Id. at 6.)
When she places a structured settlement with a life insurance

---

[3] Court notes it could not find the exact date of the call in
Klinger's notes; however, plaintiff admits this fact.  (Docket
No. 147-1 at 19.)

company, Klinger earns a commission of four percent[4] of the premium paid for any structured settlement she sells.  Id.

A plaintiff receiving compensation for physical injury may utilize a procedure by which an annuity is purchased, and the proceeds from that annuity are tax free.  (See Docket No. 132-14 at 9; Docket No. 147-1 at 21.)  This is referred to as a structured settlement.  To purchase a structured settlement, the parties must execute a settlement agreement and release and a qualified assignment which transfers from the defendant to the defendant's insurance company the payment of compensation to plaintiff.  Id. at 9-10.

On August 29, 2005, Klinger's assistant obtained quotes for structured settlement options, plugging in settlement amounts of $7,000,000 and $8,000,000, and apportioning half of those settlement amounts into structures and half into cash.  (Docket No. 132-14 at 16.)

On September 16, 2005, in an effort to settle the case, Gelpi provided Hulsey with a settlement offer of three million dollars ($3,000,000) cash and three million dollars ($3,000,000) to be used to purchase a structured settlement, including a benefits schedule for the proposed structured settlement.  (Docket No. 132-3.)  Also on September 16, 2005, Hulsey wrote to Gelpi stating that Adrian

---

[4] In the underlying case, Klinger agreed to split her commission equally with Robert Hutt ("Bob Hutt") of Twenty-First Century Group.  Id. at 8.

was "not interested in negotiating the vagaries of a structured settlement." (Docket No. 132-4.)  On September 19, 2005, Hulsey wrote to Gelpi making a settlement offer of thirty million dollars ($30,000,000), cash up front, in addition to the structured settlement amount that Gelpi offered in his September 16, 2005, letter.  (Docket No. 132-5.)

On September 21, 2005, Gelpi sent Hulsey a revised settlement offer of seven million dollars ($7,000,000) structured in two different ways:  one option would have provided Adrian a four million dollar ($4,000,000) cash payment for use in the purchase of an annuity of $8,828 per month; a second option would have provided Adrian a cash payment of three million, five hundred thousand dollars ($3,500,000) with another three million, five hundred thousand dollars ($3,500,000) to be used to purchase an annuity of $10,052 per month.  (Docket No. 132-6.)  On September 21, 2005, Hulsey rejected Gelpi's seven million dollar settlement offer, stating "since you only raised your counter by one million dollars . . . plaintiff has no counter to make." (Docket No. 132-7 at 9.) Huley further stated, "we are comfortable at 33 million dollars with you at 7 million." Id.

On May 26, 2006, Gelpi sent Hulsey a letter reiterating the same offer extended in his September 21, 2005, letter, but with updated structured benefits schedules showing a higher annuity payment due to better market conditions.  (Docket No. 132-8 at 2.)

Also in May 2006, Klinger learned that Chubb had retained Bob Hutt as Chubb's structured settlement broker.   (Docket No. 132-14 at 21.)

On June 8, 2006, Hulsey wrote to Diaz rejecting the May 26, 2006, offer, and restating plaintiff's demand of thirty-three million dollars ($33,000,000).  (Docket No. 132-9.)  On June 28, 2006, Hulsey wrote to Diaz again and submitted a revised settlement demand for $29,750,000, stating that he conveyed to Adrian "your assurances that movement on our part would be met with a significant response from your clients."  (Docket No. 132-10.)

On July 4, 2006, a newly passed tax reform law ("Act No. 117") in Puerto Rico categorized payments for mental anguish as income. See P.R. Laws Ann., Tit. 13, § 8422(b)(5).  Payments for physical injury were not categorized as income.  Id.  On January 12, 2007, Hacienda issued Administrative Determination 07-01, which advised that as of July 1, 2006, payments for mental anguish were taxable and therefore subject to withholding requirements by the payer. (See Docket No. 132-12.)

On August 11, 2006, Hulsey wrote a letter to Diaz confirming a meeting for September 11, 2006 at Hulsey's office in Charleston, South Carolina to discuss settlement, in which he reminded Diaz, "As I have mentioned on many previous occasions, [Adrian] is not interested in what you or your colleagues have to say regarding a structured offer."  (Docket No. 132-13.)  In that letter, Hulsey

also wrote, "If, on the other hand, you are willing to discuss actual cash on the table in resolution of [Adrian's] claims, which is what SHE demands, then there may still be a reason to sit down and negotiate." Id. (emphasis in original).

On the morning of September 11, 2006, John Villas from Chubb Insurance, Beverly Baker ("Baker") from Fireman's Fund, Klinger, from Mesirow, attorney Diaz, and attorney Gelpi met to discuss the forthcoming meeting at Hulsey's office. (Docket No. 132-14 at 111-112.)  The parties then convened in Hulsey's office to meet together.  It appears from Durand's deposition that she, too, was present at the meeting in Hulsey's office.  (Docket No. 132-3.)

Hulsey recalled that the defendants in the underlying case made it clear during the September 11, 2006 meeting that they would only offer a structured settlement, not cash, in order to avoid dealing with the tax withholding issue, and that the defendants indicated that structuring the settlement was the only way to avoid

the tax issue.[5]  (Docket No. 143-2 at 11-14.)  Hulsey also stated
in his deposition that Klinger indicated during the meeting that
her company had determined that a structure was tax free.  Id.
at 12.

      At the time of the September 11, 2006 meeting, Adrian did not
want a structured settlement.  It is unclear from the record which
participant in the meeting raised the tax issue for the first time.

      Durand recalls Gelpi discussing the impact of the new tax law
on the parties' ability to settle because damages that were not
previously taxable would be subject to withholding, and stating
that the only way to overcome the tax problem was to structure the
settlement through Mesirow's services.  (Docket No. 147-3 at 6-8.)
Durand also stated that Klinger confirmed that the tax could be
avoided by the structured settlement vehicle provided by Mesirow,
and that it was the only way to resolve the tax problem.  (Id.
at 8.)  Durand further stated that the defendants in the underlying

_____

      [5] Hulsey claims that the defendants were trying to force
Adrian into a structured settlement, and that no cash was offered
to her during the September 11, 2006 meeting in Charleston.  The
Court finds it puzzling, even troubling, that in Adrian's Opposing
Statement of Facts, she relies on a deposition in which her own
attorney posed a question to the deponent as follows:  "[W]as there
any statements [sic] made to the plaintiffs at the 9/11 meeting
that they could avoid a potential Hacienda problem by agreeing to
the offer that was presented to them that day, which was eight
million dollars, some cash, some annuity."  The fact that
plaintiff's own attorney states that the offer on September
11,2006, made to the plaintiff included some cash seriously if not
fatally undermines Hulsey's version of what occurred at the
September 11, 2006 meeting.  (Docket No. 147-4 at 10.)

case stated they would never pay Adrian cash without withholding the full percentage required under Hacienda's new tax law. (Id. at 9.) Adrian recalled Klinger offering a tax free settlement with no Hacienda involvement. (Docket No. 147-6 at 24.)

Klinger recalled that the defendants in the underlying case presented two eight million dollar ($8,000,000) settlement offers: the first was four million dollars ($4,000,000) up front in cash plus four million dollars ($4,000,000) structured, and the second offered four and one half million dollars ($4,500,000) up front in cash plus three and one half million dollars ($3,500,000) structured. (Docket No. 132-14 at 199-201.) Klinger stated in her deposition that the only representation she made regarding taxes was that the proceeds for a structured settlement were tax free.[6] (Docket No. 132-14 at 26-27.) At that meeting, Klinger says she also told that if Adrian had any questions they would be answered. Id.

Durand recalled Klinger making it clear to Adrian that Klinger operated separately from the defense team and had Adrian's best interests in mind. (Docket No. 147-3 at 28-29.) Durand also believed Adrian had some conversations with Klinger without Durand and Hulsey present. Id. Klinger testified in her deposition that

---

[6] In fact the benefits payments from a structured settlement are tax free. Id. at 36. According to Klinger's deposition, an annuity is taxable, but the income from a structured settlement is not taxable. (Docket No. 132-14 at 10.)

she was truthful with Adrian and intended for Adrian to rely on Klinger's statements to Adrian.  (Docket No. 147-23 at 22-23, 38.) Because Fireman's Fund was her client, Klinger said she took direct orders from Janice Johnson at Fireman's Fund.  Id.  Mesirow claims that Klinger was always viewed as part of the defense team by other participants in the negotiations.

Klinger first heard of the change in Puerto Rico's tax law on the morning of September 11, 2006, when the parties met in Hulsey's office as described in detail above.  Klinger explained in her deposition that her understanding of Puerto Rico's tax laws were based upon the discussions with the attorneys involved in the case. (Docket No. 147-23 at 15-17.)  She stated that she did nothing independent to learn about Hacienda's requirements because, on top of what she learned from counsel during discussions, "Hulsey said he has a ruling and a tax opinion that would get around Hacienda and take care of the issue."  Id.  Klinger did obtain a translated copy of the law.  (See Docket No. 166-1 at 4.)

On February 12, 2007, a pretrial conference was held in the underlying case, civil action 03-1890.  The minutes of that conference state "[t]he parties are willing to consider a structured settlement with the help of mediation" and "[t]he Court will request the assistance of Judge Acosta for this matter." (Docket No. 302, Civil Action 03-1890.)  Trial was set at that pretrial conference for March 26, 2007.  Id.

On February 14, 2007, Hulsey wrote to Diaz that he and his
client, Adrian, "spent considerable time and expense researching
the position you have taken in the negotiations," and that Hulsey
expected any settlement reached to "reflect that the payment is in
consideration for [Adrian's] physical damages . . .". (Docket
No. 132-15 at 2.)  On February 22, 2007, Diaz responded to the
February 14, 2007, letter.  Diaz advised Hulsey that the defendants
in the underlying case brought the tax issue to Hulsey's attention
in September, 2006, and that "any settlement or award by a jury on
the damages issue will be subject to a tax withholding, according
to Puerto Rico Law prior to payment."  (Docket No. 132-16 at 2.)

That same day, on February 22, 2007, Hulsey retained tax
attorney Orlando J. Rodriguez ("Rodriguez"), in San Juan, Puerto
Rico, for the purpose of providing a legal opinion in connection
with the underlying case and the Puerto Rico tax code, and to
provide an opinion on the tax issues related to Adrian's
settlement. (Docket No. 132-12 at 5-10.)  Rodriguez testified in
deposition that Hulsey wanted to know how to minimize the effects
of recent changes to Puerto Rico's Internal Revenue Code on
Adrian's settlement. Id. at 7.  Rodriguez explained that Hulsey
asked whether the tax code changes would affect structured
settlements. Id. at 8.  Hulsey's office provided Rodriguez with
some facts about the underlying case, and Rodriguez used that
information to provide Hulsey's team with a letter confirming

retention of his services and stating his understanding of the services requested.  (Id.; Docket No. 132-12 at 19-20.)  Rodriguez stated that Hulsey's office told Rodriguez that the defendants in the underlying case believed that a tax withholding would have to occur.  Id. at 20.

On February 23, 2007, Hulsey responded to Diaz's February 22, 2007, letter, stating, "You won't negotiate unless [Adrian] accepts a structured settlement that she does not want . . ." (Docket No. 123-17 at 1.)  Hulsey also wrote, "Now you state that any amounts paid to [Adrian] will be subject to your withholding even though you know that 'daños fisicos'[7] are not subject to withholding . . ."  Id.  Hulsey also wrote, "You suggested I hadn't properly advised my client about the structure and I suspect the only reason for the [September 11, 2006, meeting in Charleston] was you thought when she heard the 'truth' about your concern for her and the structure she would immediately embrace it.  As you heard from her own mouth, her own words, with no coaching needed from me, she wants to have control over her own destiny.  The meeting was over then."  Id. at 2.

On March 1, 2007, Hulsey's Puerto Rico tax attorney, Rodriguez, sent a draft opinion to Durand, Hulsey's colleague. (Docket No. 132-12 at 9.)  In that draft opinion, Rodriguez concluded that "[t]o avoid a controversy with the defendants

---

[7] The term refers to physical damages.

regarding the income tax withholding, you may consider to request the Puerto Rico Treasury Department to rule that, based on the special circumstances of this case, no income tax applies on the portion of the award that constitutes compensation for emotional injuries." (Docket No. 132-13 at 29).

On March 8, 2007, mediation was held in the underlying case before United States Senior District Judge Raymond L. Acosta. According to attorney Quetglas, who worked with Hulsey, the defendants in the underlying case offered Adrian eight million dollars cash to settle. (Docket No. 132-18 at 6.) Quetglas also recalled Hulsey rejecting that offer, and making a counter-demand of twenty-five million dollars. Id. Quetglas remembered that Hulsey made it clear that Adrian was not interested in a structured settlement; instead, Adrian and her counsel wanted a lump sum in cash. Id. at 5.

Klinger, the Mesirow representative who was at the mediation and took notes, recalled Hulsey's counter-demand as twenty-eight million dollars. (Docket No. 132-14 at 21-23 and 48.) Hulsey recalled in his deposition, based on notes he took during the mediation meeting, that the defendants offered $7,786,000, and not $8,000,000, although he states that he is not sure exactly to what his notations referred. (Docket No. 147-2 at 21-22.) Hulsey also

recalled Klinger and someone he noted as "Bob H."[8] emphasizing during the mediation that the only way around the tax withholding issue was to structure the settlement.  Id. at 21-26.  Durand stated in her deposition that in the mediation the defendants claimed that structuring the settlement was the only way around the tax issue.  (Docket No. 147-3 at 16-17, 18.)

        Klinger recalled that, at the March 8, 2007, mediation, "Hulsey stated that he had a letter from his tax person [Rodriguez] that got him out of the Hacienda ruling and so that the new tax law did not apply to him."  (Docket No. 132-14 at 23.)  In an unsworn verified declaration Hulsey denied making that statement at the mediation.  (Docket No. 147-8 at 2.)  Hulsey states that what he indicated in the mediation "was that I had consulted with a tax lawyer who advised that based upon Plaintiff's obvious and lasting permanent physical injuries and physical pain, as well as the fact she was a resident of the United Staes [sic] . . . that Hacienda would not make her the test case for the new law."  Id.  In another unsworn verified declaration, Hulsey's colleague, Durand, denied that Hulsey said he had an opinion from a tax attorney getting him out of a new tax law.  (Docket No. 147-9 at 2.)  Instead, Durand claims that Hulsey "indicated that he had consulted with a tax attorney and that based upon the opinion of that attorney and given

_____

        [8] The Court assumes this refers to Bob Hutt, another structured settlement broker retained by Chubb.

the nature of [Adrian's] injuries, she would not be subject to the Hacienda withholding requirement . . ." <u>Id.</u>  The mediation ended without the parties reaching a settlement agreement.

<u>     Trial, Settlement Proceedings and Judgment of Dismissal</u>

On March 26, 2007, trial commended in the underlying case.

On March 31, 2007, tax attorney Rodriguez authored his final opinion sent in a memorandum to Hulsey.  (Docket No. 132-12.)  In his deposition, Rodriguez stated that the major difference between his draft opinion and the March 31, 2007, final opinion was that he "added the discussion of the structured settlement and what that is," in which he had opined, "there are no specific rules in Puerto Rico Code to regulate a structured settlement."  (Docket No. 132-12 at 18, 39.)  As Rodriguez put it in his memorandum, "No opinion is expressed regarding the tax treatment of compensation for personal injuries or the taxation of payments under the structured settlement under the U.S. Code or the tax treatment in a [sic] case of a change of residence of Plaintiff."  <u>Id.</u> at 39.  Although he concluded "that there are strong legal arguments to take the position that compensation for the emotional injuries suffered by Plaintiff is not subject to Puerto Rico income tax withholding," and that "for the same reasons, the payments to Plaintiff under a structured settlement . . . would not be subject to Puerto Rico income tax withholding," Rodriguez repeated the advice rendered in his draft opinion of March 1, 2007, that "[t]o avoid a controversy

with defendants regarding the income tax withholding, you may consider to request the Puerto Rico Treasury Department to rule that, based on the special circumstances of this case, no income tax applies on the portion of the award that constitutes compensation for emotional injuries." Id. at 38-39. As to the effect of the tax law on the settlement, Rodriguez stated it "made no difference" whether the settlement was structured or not. (Docket No. 132-12 at 15.)

According to Rodriguez's deposition, Hulsey did not ask Rodriguez for advice about how to obtain an opinion or ruling regarding the tax consequences from Hacienda. Hacienda has set forth procedural guidelines for those seeking written rulings. (Docket No. 132-19.) Rodriguez stated in his deposition that one may "request a ruling based on transactions that will occur in the future" and that "most of the time times [sic] you request the opinion before the transaction takes place." (Docket No. 132-12 at 13.) Hulsey and Durand both understood, however, that Hacienda would not issue advisory opinions. (Docket No. 147-2 at 19; Docket No. 147-3 at 33.) According to Hacienda's own procedural guidelines, a request for a ruling "must contain a statement of all relevant facts relating to the transaction" which must include, among other things, "a full and precise statement of the business reasons for the transaction" and "a carefully detailed description of the transaction." (Docket No. 132-19 at 5.) In addition,

Hacienda's guidelines require all "true and complete copies of all contracts, wills, deeds, agreements, instruments and other documents pertinent to the transaction" to be submitted.  Id.  A request for ruling lacking any "essential information" will be closed if not received from the taxpayer making the request within 30 calendar days of notification.  Id. at 14.

In its own independent reading of Hacienda's guidelines, the Court finds a number of helpful instructions regarding the procedures for requesting rulings which were not cited by the parties.  First, the guidelines state clearly that Hacienda issues letter rulings on matters arising under the Puerto Rico tax code and related statutes and regulations that involve, among other things, "the time, place, manner, and procedures for reporting and paying taxes" and "the assessment and collection of taxes."  Id. at 2.  The procedural guidelines also clearly state that "[r]ulings will only be issued on prospective transactions and on completed transactions" if the request is submitted prior to the due date of the tax return on which the transaction at issue must be reported.  Id.  Hacienda guidelines then clarify that "[i]n determining the issues upon which a ruling will be issued," Hacienda will apply certain criteria.  Id. at 3.  Among those criteria, the guidelines state the following:  "A ruling will not be issued on alternative plans of proposed transactions or on a hypothetical situation."  Id. Nevertheless, [i]n any case in which the taxpayer believes that

a business emergency exists or that an unusual hardship will result from failure to obtain a ruling, he should submit a separate letter with the request for ruling setting for the facts necessary for [Hacienda] to make a determination in this regard." Id.

On April 16, 2007, the trial in the underlying civil action continued. After the plaintiff concluded her case, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 based on their contention that plaintiff had not established any breach in the standard of care required for security at the Montehiedra Mall where plaintiff was injured. (Docket Nos. 367 at 11, 369 in Civil Action 03-1890.) At the time the motion was made, however, defendants offered plaintiff $5,000,000 cash to settle the case. (Docket No. 132-20 at 3.)

The Court met with the parties in chambers that same day, April 16, 2007, during which time the settlement offer was addressed. The Court indicated during that meeting that the plaintiff should consider the settlement offered by the defendants. (Docket No. 132-18 at 8-9; Docket No. 147-1 at 10.) Quetglas believed the Court was planning to dismiss the case. Id. Hulsey claimed in his deposition that the defendants offered their cooperation to work with Hacienda to avoid tax withholdings on the settlement including allocating the settlement funds exclusively to physical damages, and that defendants assured Hulsey that

structuring the settlement would be a tax free back-up plan.  (Id.;
Docket No. 147-2 at 31-33, 38-9, 72.)

Quetglas testified in deposition that, after the meeting in
chambers, the attorneys for plaintiff "agreed at that point in time
that we had to settle the case, we didn't have a choice." (Docket
No. 132-18 at 12.)  Hulsey testified that he "felt the evidence was
sufficient" to go forward in the trial "but I told [plaintiff] what
my feeling was and what happened in the room." (Docket No. 147-2
at 35-36.)  Plaintiff testified that her attorneys advised her
"they are giving you a good offer because . . . of the
circumstances or under the circumstances . . ." and that the Court
might dismiss her case. (Docket No. 132-21 at 4.)  On the evening
of April 16, 2007, plaintiff's attorneys contacted the defense
counsel to try to increase the amount of their settlement offer to
no avail. (Docket No. 132-18 at 15.)

On April 17, 2007, before the trial continued, plaintiff
accepted the defendants' offer of $5,000,000 cash to settle the
federal and state cases.  Id. at 16.  The terms of the settlement
were discussed with the Court.   Defendants again agreed to
cooperate to minimize any tax impact on the settlement; no
specifics were mentioned, however, in the presence of attorney
Quetglas or the Court.   Id.   Again, Hulsey states that he
understood the settlement to allow for a structure in lieu of cash
as a tax-free back up, and that without that element, the case

would not have been settled.   (See Docket No. 147-1 at 11.)
According to Quetglas, however, neither the possibility of a
structured settlement or an indemnity letter was discussed during
the April 17, 2007 meeting in chambers, nor did either possibility
play any role in the settlement of the case.  (Docket No. 132-18
at 19.)  Hulsey claims that the April 17, 2007 settlement agreement
was based in part on earlier conversations during which Quetglas
was not present, in which a tax-free structure option was
discussed.  (Docket No. 147-2 at 72.)  Plaintiff testified in
deposition that she would not have accepted the settlement offer
had her attorneys not informed her that there was a possibility the
Court might dismiss her case.  (Docket No. 132-21 at 5.)

    Neither Klinger nor any other Mesirow representative of
Mesirow was present in Puerto Rico during the time of the trial or
during the April 16 and 17, 2007 settlement negotiations.   No
Mesirow representative had any contact with the plaintiff or any of
plaintiff's representatives from the March 8, 2007 mediation, when
plaintiff rejected a settlement offer, until after April 17, 2007,
when plaintiff accepted a settlement offer.[9]  (See Docket No. 132-
22 at 4; Docket No. 147-1 at 13.)

    On April 17, 2007, Janice Johnson of Fireman's Fund sent
Klinger an email informing Klinger that "it looks like [Adrian] is

---

    [9] Klinger's involvement in the underlying case ended on
October 17, 2007.  Id. at 15.

going to structure some of the $." (Docket No. 147-19 at 7.)  John
Villas emailed Bob Hutt that same day, saying, "You will need to
work with Connie as they will be accepting a structure," and, "Now
more than ever we need to make sure that the Life Companies are on
board with the Tax issue." (Docket No. 147-19 at 4-5.)

On April 19, 2007, John Villas sent an email to Bob Hutt
stating, "Remember that we will need something in writing from the
Life Company or Companies with respect to a Hold Harmless or
Indemnity on the tax issue." Id. at 4.  The email explained, "[The
Hold Harmless or Indemnity documents] will need to be reviewed by
both defense counsel, Art Diaz on behalf of Chubb and Ben Acosta,
the attorney for Fireman's Fund." Id.

On April 25, 2007, in a letter to Diaz, Hulsey proposed that
they allocate the settlement payment one hundred percent to
physical injuries, stating, "My plan is to obtain the signed
settlement agreement with the intended allocation and then have our
tax attorney meet with Hacienda and present the agreement along
with the medical summaries and expert reports to obtain tax
clearance." (Docket No. 132-23 at 1.)  Hulsey also wrote, "If
necessary, you and I can discuss the situation you mentioned to me
where the insurance company indicated a method of payment which
would indemnity your client from any detrimental tax
determination." (Docket No. 132-23 at 2.)  In his deposition,
Hulsey states that the plan had always been to bring a document

with the proposed settlement agreement to Hacienda in order to obtain a ruling regarding the tax issue prior to defendants paying out the money.  (Docket No. 132-20 at 4-6.)

On May 2, 2007, Hulsey wrote to defense counsel to confirm the terms of the settlement.  (Docket No. 132-24.)  The letter acknowledged that defendants agreed to pay plaintiff five million dollars in cash, that "as substantial consideration for this settlement, defendants jointly agreed to cooperate with plaintiff on the tax issue in all reasonable ways to minimize or eliminate any tax ramifications to the Plaintiff," and that the parties agreed that "the settlement agreement should allocate the settlement consistent with the evidence . . . 100% to physical injuries, pain, suffering and disability." Id. Hulsey concluded his letter stating, "I have attempted to set forth the basic terms of the settlement and hope I haven't forgotten any terms important to counsel." Id.  The terms of settlement as written in Hulsey's May 2, 2007, letter make no mention any structured settlement option connected to Klinger or any mention of any promise or representation by Klinger or any other Mesirow representative. Id.

On May 3, 2007, Diaz responded to Hulsey's letter and stated that while the defendants agreed in principle to a one hundred percent allocation of the settlement amount to physical injuries, they were not comfortable issuing payment on the basis of the settlement agreement alone, because that agreement was not binding

on Hacienda, which could determine at a later date that the defendants should have made a withholding. (Docket No. 32-25.) Diaz's letter requested a copy of a tax opinion to which Hulsey referred during the April 17, 2007 in-chambers settlement discussion. Id. Hulsey had claimed in the in-chambers meeting that the tax opinion indicated the settlement money could be paid through a Puerto Rico trust in order to resolve the tax withholding issue. Id. Hulsey never provided Diaz with a copy of that opinion. (Docket No. 132-26 at 5-6.)

On May 7, 2007, Hulsey filed electronically a stipulation of dismissal on behalf of all parties indicating, among other things, that pursuant to the settlement agreement defendants would pay plaintiff a confidential amount of money. (See Docket No. 375, Civil Action 03-1890.) The parties asked the Court to retain jurisdiction to enforce the settlement agreement. Id.

On May 9, 2007, the Court entered judgment dismissing plaintiffs claims in 03-1890 with prejudice and, pursuant to the parties' request, retained jurisdiction to enforce the terms of the settlement. (Docket No. 379 in Civil Action 03-1890.)

    Events Following Judgment in Underlying Case

On August 1, 2007, Diaz sent a draft settlement agreement to the Hulsey Litigation Group that proposed defendants issue their settlement payments once Hacienda issued a waiver exempting the settlement from withholding or, if plaintiff chose not to go to

Hacienda for a ruling, that defendants issue payment subject to withholding in accordance with the applicable provisions of Hacienda. (Docket No. 132-28 at 8.)

Also on August 1, 2007, Klinger learned that another structured settlement broker, Joe DiGangi, from the company Millennium Settlements ("Millennium") was working on Adrian's settlement. (Docket No. 132-14 at 18.) Klinger sent an email to Hulsey and Durand on August 8, 2007, asking whether Adrian was working with Joe DiGangi. (Docket No. 132-40.) Durand responded the following day by email to confirm that Adrian had indeed been talking with Joe DiGangi and wrote that "the fact that he can provide certain services to her above and beyond a structure is attractive to [Adrian]." Id. Durand also wrote, "since we have not finalized anything with respect to the settlement agreement and do not have the final word from the defendants with respect to their position, we and [Adrian] have not made a final decision with respect to anything" and "things are still up in the air." Id.

On August 6, 2007, Hulsey put in writing, in a letter to Diaz, that he understood the settlement reached on April 17, 2007, to be one in which all settlement monies would be allocated to plaintiff's physical damages, and that the defendants' would cooperate on the tax issue. (Docket No. 132-28.) Hulsey argued in his letter that the defendants' latest settlement draft proposals

indicated that the defendants were not cooperating on the tax issue.  <u>Id.</u>

On August 7, 2007, Gelpi, who was copied on Hulsey's August 6, 2007 letter to Diaz, sent Hulsey's letter to the other defense counsel.  (Docket No. 132-29.)  Gelpi advised the other defense attorneys that the settlement payments from the defendants could not be issued without tax withholdings unless there was a letter from Hacienda exempting plaintiff's compensation from withholding from the source.  <u>Id.</u>  No mention was made of Mesirow in Gelpi's letter to defense counsel.  <u>Id.</u>  That same day, Diaz responded to Gelpi's email and asserted, "Like [Gelpi], my recommendation to Chubb will be not to pay a cent until" Hacienda provides "waivers, guarantees and/or rulings freeing Chubb from any and all liability to the Treasury Department . . ."  <u>Id.</u>  Diaz's letter did not mention Mesirow.  <u>Id.</u>

On August 8, 2007, Diaz replied to Hulsey's August 6, 2007, letter, stating, "[f]irst, while it is true that the defendants agree to fully cooperate with [plaintiff] on the tax issue, it was certainty made clear that the defendants were not going to proceed with the payment until they received the necessary assurances that they would not be responsible to [Hacienda] for not making the statutorily provided withholding to a non-resident of Puerto Rico." (Docket No. 132-30 at 1.)

On August 10, 2007, Klinger sent an email to Durand asking, "are you still considering setting up the trust that was previously discussed in Puerto Rico . . . in case any taxes are owed." (Docket No. 132-20 at 8.)

On August 17, 2007, Klinger noted in her records that Durand had called her at 3:23 p.m. and indicated that the best way to avoid tax withholdings would be for plaintiff to pay attorneys fees to the Puerto Rico firm and structure the rest of the settlement, but that Durand still had to check with the defense attorneys to make sure they were comfortable with that course of action. (Docket No. 132-14 at 56.)  In her deposition, Durand stated that she told Klinger during the August 17, 2007, conversation that the defendants, not the plaintiff, could pay the attorney's fees to the Puerto Rico firm, that she was never concerned that defendants would be uncomfortable, and that the discomfort to which she referred regarded whether they would pay the attorney's fees. (Docket No. 147-9 at 4.)  That same day, at 6:08 p.m., Hulsey sent an email to Diaz stating that Adrian intended to "structure through Connie Klinger's company so there would be no Hacienda issues" and that "[w]e understand from [Klinger] that [Mesirow] will issue an indemnity letter in favor of the defendants."  (Docket No. 132-41 at 3.)  That email was sent only to Diaz, and not copied to any other defense attorney or to Klinger.  Id.

On August 24, 2007, Durand sent an email to Diaz, but not to
any other defense attorneys or Klinger, stating that, according to
Klinger, the life insurance companies were going to provide an
indemnity letter to defendants.  Id.  Diaz forwarded these email
exchanges to other defense attorneys and to Klinger on that same
day.  Id.  Gelpi emailed a reply to all the recipients of the
message forwarded by Diaz which stated, "I still can't understand
why Hulsey has not obtained a ruling from Hacienda stating that all
or part of the payment is exempt from the withholding requirement,"
and proposing that if the ruling were not submitted "we file a
motion" explaining the problem "and request the Court to notify
Hacienda to appear and indicate how much must be withhold [sic]."
Id. at 2.  Klinger responded to Gelpi's email within a half an
hour, stating in her email, "As I explained to [Durand], when I
spoke to her last week, and I said to you all this week, the life
companies aren't issuing an indemnity letter."  Id. at 1.  Klinger
emphasized that "there has to be some ruling [from Hacienda] or
agreement between the parties" regarding the percentage of
withholding on the settlement.  Id.

On August 27, 2007, Joe DiGangi of Millennium Settlements
emailed Adrian to give her his first impression that, among other
things, "it looks like the tax may be deferred, not avoided in the
case of 'loss of income' and 'pain and suffering'."  (Docket
No. 132-39 at 80.)  He further stated that he was not yet in a

position to properly advise her in this area.  Id.  Joe DiGangi
later testified in his deposition that Klinger told him one hundred
percent of the settlement had to be structured for tax reasons.
(Docket No. 147-33 at 7.)  He also stated that Klinger indicated
she would be providing her clients with a hold harmless agreement
regarding future tax implications.  Id. at 13.  He did not recall,
however, who would issue the hold harmless letter or agreement.
(Docket No. 166-6 at 4-5.)

On August 31, 2007, Adrian filed a motion to vacate judgment
and set a new trial.  (Docket No. 382, Civil Action 03-1890.)
Adrian alleged in that motion that the defendants in 03-1890 told
Adrian that if Adrian used Mesirow to purchase a structured
settlement there would be no Puerto Rico tax consequences and that
Mesirow was willing to give the underlying defendants an indemnity
letter.  Id.  Adrian also argued that she could not obtain an
administrative determination or a letter ruling from Hacienda
"without a written agreement reflecting a meeting of the minds of
the parties."  Id.

On September 13, 2007, the Court denied Adrian's motion to
vacate judgment and set trial, and ordered Adrian to "proceed to
initiate an administrative proceeding with [Hacienda] regarding the
taxable nature of the settlement pursuant to [Hacienda's]
Administrative Determinations 07-01 and 05-02."  (Docket No. 387

at 4, Civil Action 03-1890.)  Adrian never requested a ruling from Hacienda regarding the tax issue.

On October 3, 2007, Adrian filed a notice of appeal of the Court's September 13, 2007 order.  (Docket No. 388 in Civil Action 03-1890.)  On March 4, 2008, as part of her appeal effort, Adrian filed her brief, in which she claimed that the Court erred in refusing to set aside the judgment of dismissal, "because the parties never reached a meeting of the minds and as a result there is no settlement."  (Docket No. 132-32 at 6.)  Manley Berenson, in its brief for appellee, which was signed by Gelpi and Diaz, argued that there was a binding settlement, that Hulsey had agreed to secure a ruling from Hacienda, that this was an essential obligation plaintiff undertook as part of the settlement agreement, that her failure to secure the ruling was a breach of her own obligations under the settlement agreement, and that until she remedied her own breach first, she could not compel the defendants to pay the settlement amount.  (Docket No. 132-33 at 24, 28-30.)

On May 22, 2008, Hacienda issued Administrative Determination 08-04, reversing prior determination 07-01 and clarifying that payments for emotional damages resulting from physical injury are not income and therefore are not subject to taxation or withholding.  (Docket No. 132-35.)  Hacienda also stated that Administrative Determination 08-04 would be effective retroactively to July 1, 2006.  Id.  Adrian continued her appeal

efforts until Hacienda issued its May 22, 2008, Administrative
Determination which effectively made the tax issue moot.

During the summer of 2008, Adrian received all of the
settlement funds. (Docket No. 132-21 at 3.)  On June 13, 2008,
plaintiff voluntarily dismissed her appeal of the Court's
September 13, 2007 order in 03-1890. (See Docket in First Circuit
Court of Appeals for Appeal No. 08-1074; Docket No. 394-3 in Civil
Action 03-1890.)  That same day, Continental Casualty Company and
Wausau Insurance Company, as insurers for Manley Berenson, executed
an agreement with plaintiff to pay their portions of the settlement
without making any withholding. (Docket No. 394-2, Civil
Action 03-1890.)  On June 18, 2008, Chubb Insurance filed a special
appearance to deposit its share of the settlement with the Clerk of
the district court. (Docket No. 394, Civil Action 03-1890.)  On
June 20, 2008, Chubb and Fireman's Fund reached an agreement with
plaintiff to each pay interest at an agreed upon rate, in addition
to their respective shares of the settlement payment ($1,115,656.14
each). (Docket No. 132-36.)  On June 23, 2008, Fireman's Fund
issued a check to plaintiff for its share of the settlement
including the agreed upon interest, $1,171,382.14. (Docket No.
132-37.)  That same day, ACE deposited in the district court
$768,687.72 as payment for its share of the settlement. (Docket
No. 397, Civil Action 03-1890.)  Chubb also issued a separate check
for payment of agreed upon interest to Hulsey for $55,726 on the

same day.  (Docket No. 132-38.)  The next day, on June 24, 2008,
plaintiff filed a motion seeking that the Court order ACE to pay
interest on the amount deposited.  (Docket No. 399, Civil
Action 03-1890.)  On June 26, 2008, ACE opposed plaintiff's motion
and explained that it could not have issued payment previously,
because it could not pay settlement funds as part of a settlement
that plaintiff had argued did not exist as part of her appeal.
(See Docket No. 403, Civil Action 03-1890.)  The Court denied
plaintiff's request for interest on June 30, 2008.  (Docket
No. 404, Civil Action 03-1890.)

     Adrian never requested, and Mesirow never provided, a quote
for a structured settlement utilizing all of the settlement funds
Adrian was to receive.  (Docket No. 132-21 at 6.)  Adrian never
purchased a structured settlement from Millennium Settlements.  Id.
at 90.

     Hulsey claims that Klinger made a promise that Mesirow would
provide an indemnity letter to the defendants in the underlying
case to reimburse them for any tax liability should Hacienda come
after them for failing to withhold taxes; Hulsey could not recall,
however, when that promise was made.  (Docket No. 147-2 at 43-44.)
Durand stated in her deposition that she was under the impression
that Mesirow had given the defendants an indemnity letter or a hold
harmless agreement providing that the defendants would not be
exposed to tax liability.  (Docket No. 147-3 at 14.)

Klinger stated that she never made a promise about an indemnity letter; that in fact it was Bob Hutt who suggested the idea during the mediation before Judge Acosta that the life companies, the companies that would issue the annuity, provide an indemnity letter to protect the defendants from liability. (Docket No. 166-2 at 5.) According to Klinger, she did not think the life companies would do that. Id. Klinger stated that she discussed the idea of an indemnity letter with some of the life companies with whom Adrian might structure the settlement. (Docket No. 147-23 at 32-36.) Klinger also stated she did not recall any attorney ever making a representation that she or Mesirow could solve the tax problem related to Adrian's settlement. Id. at 37. On March 10, 2007, Bob Hutt sent an email to, among others, Fireman's Fund, Chubb, Klinger and Diaz that purported that some of the life companies' legal departments were willing to accept a completely tax free structured settlement. (Docket No. 147-24 at 2.)

## IV. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law."  FED.R.CIV.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  Id. at 252.  It is therefore necessary that "a party

opposing summary judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## V.   Legal Analysis and Discussion

### A.   Negligence, Negligent Misrepresentation, and Fraudulent Inducement

Adrian's claim for negligent misrepresentation embodies her claim for negligence because the crux of both claims is that Mesirow failed to keep a promise to Adrian in a manner that breached a duty of care that Mesirow owed Adrian. Therefore, the Court analyzes them together under the standard for negligent

misrepresentation.[10]   Quail Hill, LLC v. County of Richland, 692
S.E. 2d 499, 508 (S.C. 2010) ("Although pled separately, we find
Quail Hill's claim for negligence is essentially subsumed in the
negligent misrepresentation cause of action").

     To prove negligent misrepresentation, Adrian must prove
that:

> (1) the defendant made a false representation to the
> plaintiff; (2) the defendant had a pecuniary interest in
> making the statement; (3) the defendant owed a duty of
> care to see that he communicated truthful information to
> the plaintiff; (4) the defendant breached that duty by
> failing to exercise due care; (5) the plaintiff
> justifiably relied on the representation; and (6) the
> plaintiff suffered a pecuniary loss as the proximate
> result of his reliance upon the representation.

West v. Gladney, 341 S.C. 127, 134 (Ct. App. 2000).

     To prove her claim of fraudulent inducement, Adrian must
establish:

> (1) a representation; (2) its falsity; (3) its
> materiality; (4) either knowledge of its falsity or

_____

[10] Indeed, Adrian's own opposition brief (Docket No. 147)
contains no separately labeled analysis of the legal basis for her
negligence claim.  Her opposition brief contains a strange,
manifesto-like introduction to its "arguments and authorities"
section referring not to the legal basis for her claims, nor to the
controlling legal standards for her claims, nor any well-supported
refutations of Mesirow's grounds for dismissal, but to the general
premise that Mesirow broke its promise, a premise Adrian repeats in
this section repeatedly and in various manners, yet which she fails
to connect explicitly with any particular theory of liability upon
which she claims relief. (Id. at 6-15.) The opposition brief does
contain a section addressing the duty of care allegedly owed to her
by the defendant and a section addressing negligent
misrepresentation, and it is these sections that the Court
considers in determining whether there exists a triable issue of
fact as to Adrian's claim of negligent misrepresentation.

> reckless disregard of its truth or falsity; (5) intent
> that the representation be acted upon; (6) the hearer's
> ignorance of its falsity; (7) the hearer's reliance on
> its truth; (8) the hearer's right to rely thereon; and
> (9) the hearer's consequent and proximate injury.

Armstrong v. Collins, 366 S.C. 204, 218-219 (S.C. App. 2005)

(citing Regions Bank v. Schmauch, 354 S.C. 648, 672, [582 S.E.2d

432, 444-45] (Ct.App. 2003)).  "The key difference between fraud

and negligent misrepresentation is that 'fraud requires the

conveyance of a known falsity, while negligent misrepresentation is

predicated upon transmission of a negligently made false

statement'."  Id. at 220 (citing Brown v. Stewart, 348 S.C. 33, 42,

[557 S.E.2d 676, 680-81] (Ct. App. 2001)).  A plaintiff's failure

to prove any of the required elements, is "fatal" to either claim.

Turner v. Milliman, 381 S.C. 101, 113 (S.C. App. 2009) (citing

Brown v. Stewart, 348 S.C. 33, 41 (Ct. App. 2001).

     Mesirow asserts that Adrian has failed to establish a

number of elements required for the above stated claims, namely,

that she reasonably relied on representations allegedly made by

Klinger, that Klinger owed her a duty of care, that Klinger

breached that duty of care, and that Adrian suffered any injury

resulting from Klinger's actions.[11]   The Court considers each in turn.

###   i.   Reasonable Reliance

Mesirow correctly asserts that Adrian fails to prove her reliance was reasonable and, subsequently, that Adrian fails to establish element five of negligent misrepresentation and elements seven and eight of fraudulent inducement.  Adrian claims she relied on Klinger's representation that structuring the settlement would be tax free and would resolve any Hacienda issues.  (Docket No. 147 at 9.)  She argues she would not have settled her case were it not for her reliance on these representations.  Even if Klinger in fact made this representation,[12] Adrian must prove that her reliance on the alleged misrepresentation was reasonable.   Harrington v.

---

[11] Mesirow also maintains that even if it represented to Adrian that a structured settlement would have no tax consequences, that representation was not false, given that Hacienda later issued its Administrative Determination 08-04 stating that payments for emotional injuries were not taxable.   The Court rejects this argument; "The truth or falsity of a representation must be determined as of the time it was made or acted on and not at some later date."  Winburn v. Insurance Co. Of North America, 287 S.C. 435, 440 (Ct. App. 1985).

[12] Adrian's opposition brief devotes a whole section to showing that there is an issue of material fact as to whether such a promise or representation was made (see Docket No. 147 at 9-11). Mesirow does not base its summary judgment motion, however, on the grounds that no such representations was made; in fact, Mesirow assumes for the sake of argument that such a representation was made, then argues for dismissal on other grounds.  (Docket No. 132 at 16.) The Court therefore adopts that assumption and proceeds to analyze plaintiff's claims as though Mesirow made the representations alleged.

Mikell, 469 S.C. 518, 522 (Ct. App. 1996)(citing AMA Management
Corp. V. Strasburger, 309 S.C. 213, 223 (Ct. App. 1992).

        According to Mesirow, Adrian cannot show that her
reliance was reasonable because the alleged misrepresentation
regarded a matter of law and regarded matters plaintiff could
ascertain independently. "There is no liability for casual
statements, representations as to matters of law, or matters which
plaintiff could ascertain on his own in exercise of due diligence."
Id. (citing AMA Management Corp., 309 S.C. at 874. A plaintiff's
reliance is justified only if "the defendant occupies a superior
position to the plaintiff with respect to knowledge of the truth of
the statement made." O.C. Gruber v. Santee Frozen Foods, Inc., 309
S.C. 13 (Ct. App. 1992).

        Adrian implies that Klinger, as a licensed life
insurance agent, a certified structured settlement consultant, and
a member of the National Structured Settlements Trade Association,
whom Adrian trusted to keep Adrian's best interests in mind, held
herself out as someone occupying a superior position as to the tax
matters as issue. Further, Adrian argues that Klinger's promises
"were made without any qualification that Plaintiff get any tax
advice." (Docket No. 147 at 19.) This argument is without merit.

        The basis of Adrian's negligent misrepresentation
and fraud claims is that she relied upon Klinger's statements
regarding the tax liability of a structured settlement. Klinger's

education, certifications, and years of experience relate to her
work in life insurance and structured settlements; they do not
pertain to or suggest any expertise or special knowledge in Puerto
Rico tax law, or any tax law for that matter.  Adrian cites no
legal authority to support her contention that a plaintiff may rely
upon a defendant's statements if those statements were unqualified
by a suggestion to seek outside advice.

        Mesirow also argues that Adrian's reliance on
Klinger's representations was unreasonable because under South
Carolina law a plaintiff has a 'duty to use reasonable prudence and
diligence in identifying the truth with respect to the
representations made to him'."  (Docket No. 132 at 17) (citing Bank
v. Schmauch, 354 S.C. 648, 672 (Ct. App. 2003).  As Mesirow points
out, and as the record makes clear, Adrian in fact did seek
outside, independent advice on the tax implications of a settlement
with the underlying defendants.  In a final draft of his
professional legal tax opinion, attorney Orlando Rodriguez issued
his conclusion that, although there were strong legal arguments to
support a finding that compensation for Adrian's injuries,
including compensation for emotional injuries in the form of a
structured settlement, would not be not subject to Puerto Rico
income tax withholding, he nevertheless recommended that "[t]o
avoid a controversy with defendants regarding the income tax
withholding, you may consider to request the Puerto Rico Treasury

Department to rule that, based on the special circumstances of this case, no income tax applies on the portion of the award that constitutes compensation for emotional injuries." Rodriguez's conclusion indicated only that strong legal arguments supported a finding that Adrian's compensation would not be taxable; he clearly hedged and suggested that, under these particular circumstances, Adrian should nevertheless get a ruling from Hacienda to be sure. In addition to Rodriguez's unequivocal recommendation that Adrian get a ruling from Hacienda, many participants in the settlement negotiations leading up to the April 17, 2007 agreement voiced concerns on numerous occasions in Adrian's presence and in the presence of her counsel about the potential tax liability, and asked for or recommended that Hulsey and his team obtain clarity by going to Hacienda for a ruling. Joe DiGangi of Millenium Settlements also voiced his view that the tax implications were unclear. Finally, following the April 17, 2007 settlement agreement in the underlying case, the Court ordered Adrian to obtain such a ruling due to the ambiguities of the tax consequences of her settlement.

Adrian's only retort to Mesirow's argument is that, "[w]hether Plaintiff's counsel had tax advice or not, Mesirow made representations that it would provide a structure that took care of the Hacienda issue and then reneged on its obligations" and that "the promises and assurances made by Mesirow, were made long before

Plaintiff sought any independent tax advice." (Docket No. 147 at 19.) Adrian's argument, which is purely rhetorical and finds no basis in the law, is that, in essence, even though she was advised both by her own tax attorney to seek an Hacienda ruling, heard the ongoing concerns of other participants and another settlement broker throughout the settlement negotiations about the possibility of exposure to tax liability, and was later ordered by the Court to obtain an Hacienda ruling to clarify any tax consequence, her reliance on Kilnger was reasonable because Klinger made a "promise" that Klinger did not keep.

Adrian's argument ignores the context in which Klinger's alleged promise was made, a context in which Klinger's alleged representations about tax liability were called consistently into question by all parties involved in the settlement negotiations. Adrian's counsel's own actions demonstrated that the tax issue remained an issue of concern, in that a tax attorney was called in to research independently the tax law, and that an indemnity letter was sought. It is abundantly clear from the record that no one was sure or confident about the tax liability attached to Adrian's settlement. Adrian was not justified in relying on Klinger's representations against that backdrop of doubt.

It is well settled that, "[W]hile issues of reliance are ordinarily resolved by the finder of fact, 'there can be no

reasonable reliance on a misstatement if the plaintiff knows the truth of the matter'." <u>McLaughlin v. Williams</u>, 379 S.C. 451, 457-58 (Ct. App. 2008) (quoting <u>Gruber v. Santee Frozen Foods, Inc.</u>, 309 S.C. 13, 20 (Ct. App. 1992)).  There is no genuine issue of fact when "the undisputed evidence clearly shows the party asserting reliance has knowledge of the truth of the matter . . ." <u>Id.</u> at 458.  Adrian could not have relied reasonably on Klinger when she was advised and ordered by other, more knowledgeable sources to seek a ruling that would have clarified the very issue about which Klinger's alleged misrepresentations regarded.  In fact, Adrian's apparent unwillingness to obtain the tax ruling[13] in the face of her own tax attorney's advice underscores the fact that she chose to rely on the information (Klinger's) she most liked, not on the information and advice upon which she was justified in relying (her attorney's, the Court's, Hacienda's).

Furthermore, Mesirow is correct that Adrian's reliance on Klinger's statements was unreasonable for another reason; those statements regarded matters of law, which are not actionable.  Adrian makes the incredible, even absurd argument that

---

[13] Adrian argues unconvincingly that she could not get the ruling from Hacienda because, in order to issue such a ruling, Hacienda required the presentation of a final agreement that Adrian claims she was unable to obtain from the defendants.  According to the Court's independent review of Hacienda's guidelines for requesting a claims ruling, Adrian indeed could have sought the ruling without such a document; therefore her decision to not seek the ruling was her responsibility alone.

her claims are "not based upon a misrepresentation of a matter of law." (Docket No. 147 at 20.) She maintains that whether a structured settlement would have in fact been taxable by Hacienda is irrelevant, and that, instead, what matters is that she relied upon Klinger's representation that if Adrian decided to structure the settlement, there would be no tax consequences, the Hacienda issue would be resolved, and that all assurances were in place to make the underlying defendants comfortable. Id. According to Adrian, "[i]f Defendant did not have any of the underlying issues worked out ahead of time, it should never have made the promises." (Docket No. 147 at 21.) Plaintiff's argument that her claims are not based on a misrepresentation involving a matter of law is pure sophistry. The Court flatly rejects that argument and finds that Adrian's reliance on Klinger's statements was unreasonable because those statements regarded matters of law.

         Like a broken record, Adrian's only argument in response to every basis for summary judgment raised by the defendant is that defendant "broke its promise." Adrian's broken promise argument, though repeated emphatically and in response to every single one of Mesirow's grounds for summary judgment, is disconnected to the standards under which the Court must analyze Mesirow's motion. In fact, both broken promises and expressions of opinions are not alone sufficient to establish fraud or negligent misrepresentation. See Winburn, 287 S.C. at 440, 442. Even if

Klinger did break her promise that she could provide a tax free
structure to Adrian, as Mesirow argued and supported by reference
to legal authority, Adrian knew independently that such a promise
might be impossible and might constitute an incorrect opinion about
Puerto Rico tax law.  For this reason as well, Adrian's wilful
determination to avoid obtaining the clarity she was recommended
and ordered to obtain makes her "reliance" on Klinger's
representations about what Mesirow could and could not do to
protect the settlement funds from taxation unreasonable at best,
and contrived at worst.

### ii.  Duty of Care

Even if Adrian's reliance on Klinger's statements
regarding matters of law was reasonable, Adrian has also failed to
show that Mesirow breached any duty it owed her.  Adrian maintains
she was damaged "as a result of Mesirow's failure to exercise *due
care* before making the representations regarding their ability to
put the settlement in a structure which would take care of the
Hacienda issues."  (Docket No. 147 at 19) (emphasis added).
Mesirow argues that, as a matter of law, Adrian had no right to
rely on Klinger's statements regarding Hacienda tax requirements
because there was no confidential or fiduciary duty owed by Mesirow
to Adrian.  Although the Court finds that Klinger did not have a
fiduciary duty to Adrian, it finds that Klinger did have a duty to

exercise reasonable care in her interactions with the settlement negotiations.

"A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction." Winburn, 287 S.C. at 441 (internal citations omitted). "'The fact that the information is given in the course of the defendant's business, profession, or employment is sufficient indication that he has a pecuniary interest in it, even though he receives no consideration for it at the time'." Id. (internal citations omitted). Klinger clearly had a pecuniary interest in reaching a settlement agreement; she stood to earn a commission in the event an agreement on a structured settlement could be reached. She therefore had a duty to Adrian to provide reasonable care.

The determination of whether a fiduciary relationship exists is an equitable issue to be determined by the court. Hendricks v. Clemson Univ., 353 S.C. 449, 458 (2003). "'A confidential or fiduciary duty exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence'." Armstrong, 366 S.C. at 221 (citing Island Car Wash, Inc. v. Norris, 292 S.C. 595, 599 (Ct. App. 1987). Although the evidence must show the entrusted party "actually accepted or induced the confidence placed in him,"

State v. Parris, 353 S.C. 582, 593 (Ct. App. 2003) (quoting Brown
v. Pearson, 326 S.C. 409, 423 (Ct. App. 1997)), still, the "facts
and circumstances must indicate that one reposing the trust has
foundation for his belief that the one giving the advice or
presenting argument is acting not in his own behalf, but in the
interest of the other party."  Id.  In other words, to determine
whether a fiduciary relationship existed, a court must examine the
specific nature of the relationship between the parties.
Armstrong, 366 S.C. at 222.

        Adrian argues that Mesirow owed her fiduciary duties
because Mesirow acted as a broker and, under South Carolina law,
brokers' relationships with buyers are treated as business
relationships which are often viewed as embodying fiduciary duties.
The case law cited by Adrian, however, does not support applying
such an analogy in her case.  First, the primary broker-client or
broker-buyer relationship here that would come closer to the sort
of business relationship alluded to by Adrian's analogy was not
between Mesirow and Adrian, but between Mesirow and Fireman's Fund,
and perhaps with the other defendants.  Second, even though Adrian
may have exhibited her trust in Klinger's judgment, and even though
Klinger may have intended for Adrian to trust Klinger's judgment,
the fact is that Klinger worked for the defense side of the
underlying case, and she took direction ultimately from Fireman's
Fund; she was not beholden to Adrian.  As the record shows, all of

the emails and other forms of correspondence between Klinger and
the defense team show that Klinger acted as a member of the defense
team.  Furthermore, Klinger and the defense team met to create a
unified strategy prior to the September 11, 2006 meeting with
Adrian and her attorneys.  In other words, Klinger's determination
to make a sale may have resulted in a relationship with Adrian that
Adrian now believes ought to have compelled a stronger duty from
Klinger, but "[a]s a general rule, mere respect for another's
judgment or trust in his character is usually not sufficient to
establish such a [fiduciary] relationship."  <u>Burwell v. South
Carolina Natl Bank</u>, 288 S.C. 34, 41 (1986).

### iii. Breach of Duty

Regardless of what kind of duty was owed to Adrian
by Mesirow, the Court finds that Mesirow did not breach it.
Regarding the statements that Klinger allegedly made to Adrian
about Mesirow's ability to provide a tax free structure, there is
no evidence on the record that Klinger knew her statements to be
false.  There is evidence, to the contrary, that there may have
been confusion or miscommunication about the meaning of the
allegedly promised "tax-free structure."  Klinger claims that any
statement she may have made about a tax free structure referred
only to the tax-free nature of the structure's proceeds to Adrian,
not to any potential tax withholdings pursuant to Puerto Rico law.
Regardless of whether Klinger's statements were miscommunicated or

misinterpreted, there simply is nothing on the record to indicate
that Klinger made either intentionally false or even negligent
statements.  What is clear is that no one was sure about the state
of Puerto Rico's tax law implications for awards for emotional
damages in settlement structures, and that Adrian was made aware of
the concerns over the possibility that taxes might be applicable to
her settlement.

        Adrian also argues that Klinger breached her duty to
Adrian by failing to investigate properly the Puerto Rico tax laws.
In theory, the Court agrees that "a duty to exercise reasonable
care in giving information exists when the defendant has a
pecuniary interest in the transaction," Harrington v. Mikell, 321
S.C. 518, (Ct. App. 1996) (internal quotation and citation
omitted).  Nevertheless, because Adrian has not cited any case law
imposing a duty on a structured settlement broker, or any other
kind of broker, to investigate potential unknown investment risk,
the Court finds no breach of duty to investigate here.  Cowburn v.
Leventis, 366 S.C. 20, (Ct. App. 2005) (finding no duty to
investigate known investment risks)(internal citations omitted).

        Even if such cases were cited by defendant, the
record shows that Klinger acted diligently to research both the
possible tax consequences of a structured settlement by reading a
translated version of the Puerto Rico tax code and discussing the
tax issue in numerous communications over several years with the

participants, and the methods of avoiding tax consequences by contacting various life companies to inquire about the possibility of obtaining from them indemnity letters to protect the defendants. Although Klinger's efforts may not have been successful, the record shows that those efforts were made.  "The duty of care is not duty to take every possible care, still less is it a duty to be right; it is the familiar duty to exercise that care a reasonable man would take in the circumstances." ADA Management Corp., 309 S.C. at 874.  Because Klinger's actions and efforts were more than reasonable in the circumstances, the Court finds that neither she nor Mesirow breached any duty.

### iv.  Causal Relationship and Injury

Finally, Mesirow argues that because it played no role in the defendants' decision with regard to the settlement proceedings, there is no causal relationship between Mesirow's alleged conduct and plaintiff's alleged damages.  Adrian claims she was injured because of the delay between the moment of the April 17, 2007 settlement agreement and her receipt of her settlement funds, and because she lost her opportunity to go to

trial.[14]   She claims that even though no one from Mesirow was present during the April 17, 2007 settlement proceedings and agreement, her decision to settle on that date was motivated in great part by Mesirow's statements during prior conversations.  She therefore claims Mesirow caused the injuries she claims she sustained as a result of the April 17, 2007 settlement decision.

Neither party briefed the Court sufficiently on this issue of causality - for example, whether any case law supports Adrian's contention that conversations from months and years prior to a transaction could have been a proximate cause of that transaction under South Carolina law.  Nor did the parties brief the Court regarding the important matter of what constitutes an injury under the law - for example, whether Adrian's claimed injuries suffice as losses for the purposes of establishing negligent misrepresentation or fraud.  This Court finds it rather bewildering that Adrian claims to have been injured at all; she received all of the funds agreed upon on April 17, 2007, plus interest, and Adrian has specified no specific harm suffered as a result of the delay in payment.

---

[14]  Adrian is correct that Mesirow focuses needlessly on trying to prove that Adrian would not have won her underlying case in trial, and therefore that Adrian did not lose the opportunity to win.  The Court could not possibly and will not endeavor to determine the outcome of that case here.  In any event, the chances of Adrian's success in her underlying case are irrelevant to the issues being considered.  What matters is only whether Adrian can show that she suffered an injury or loss because of actions undertaken by Mesirow.

Nevertheless, even assuming the claimed injuries as stated are adequate under the law, Adrian has failed to show a sufficient causal relationship between her injuries and Mesirow's actions.  Adrian went to trial after hearing all of the statements she alleges Klinger made regarding settlement options.  That fact alone shows that Mesirow's alleged representations did not cause Adrian to settle, or Adrian would have settled prior to trial.  Something clearly happened between Mesirow's alleged statements and April 17, 2007, and that something was the trial proceedings and the defendants' Rule 50 motion.  Adrian's decision to settle her case occurred directly after the parties argued the Rule 50 motion with the Court in the underlying case.  The record shows that Adrian's counsel indicated that the Court might dismiss the case, and Adrian decided after hearing that information to settle with the defendants.  It was the possibility of dismissal, and not Mesirow's representations, that motivated Adrian's April 17, 2007 decision.  Accordingly, Adrian has failed to show that Mesirow caused the alleged injuries.

For all of the foregoing reasons, because Adrian failed to show that her reliance upon Klinger's statements was reasonable, because she failed to show that Mesirow breached any duty, and because she failed to show that Mesirow's actions were the proximate cause of Adrian's injuries, the Court concludes that Adrian cannot establish all of the required elements for her

negligent misrepresentation and fraud claims.  For those reasons,
Mesirow's motion for summary judgment as to those claims was
previously **GRANTED**, and those claims **DISMISSED**.

**B.   Remaining Claims: Breach of Fiduciary Duty, Promissory Estoppel and Equitable Estoppel**

Because the Court has determined that no fiduciary
relationship existed between Adrian and Mesirow, the Court
previously **GRANTED** Mesirow's motion for summary judgment as to
Adrian's claim for breach of fiduciary duty.  That claim has also
been **DISMISSED**.

Both promissory estoppel and equitable estoppel contain
required elements that the Court's analysis has already found
lacking.  "In order to recover under a theory of promissory
estoppel, a claimant must demonstrate:  (1) the presence of a
promise unambiguous in its terms; (2) reasonable reliance on the
promise; (3) the reliance was expected and foreseeable; and (4)
injury in reliance on the promise." Satcher v. Satcher, 351 S.C.
477, 483-84 (Ct. App. 2002).  One claiming equitable estoppel must
show, as to him- or herself, a "(1) lack of knowledge and of the
means of knowledge of the truth as to the facts in question,
(2) reliance upon the conduct of the party estopped, and
(3) prejudicial change in position." State Acc. Fund v. South
Carolina Second Injury Fund, 693 S.E.2d 441, 446 (S.C. App. 2010)
(quoting Rushing v. McKinney, 370 S.C. 280, 293-94 (Ct. App.

2006)).  The Court has already concluded that Adrian's reliance on Klinger's alleged statements was unreasonable.  The Court has also already concluded that Adrian had independent knowledge regarding the facts in question.  Because of those conclusions, Mesirow's motion for summary judgment as to her claims for estoppel were **GRANTED** and both claims were **DISMISSED.**

## VI.  Conclusion

For the reasons stated above, Mesirow's motion for summary judgment was **GRANTED** in its entirety, and all of Adrian's claims were **DISMISSED WITH PREJUDICE.**  (See Docket No. 182.)  Judgment shall now be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 9, 2010.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE